LITEL, Respondent, vs. FIRST NATIONAL BANK OF OREGON, Appellant.

*May 9—October 9, 1928.*

For the appellant there was a brief by *Gilbert, Ela, Heilman & Raeder* of Madison, and oral argument by *Emerson Ela*.

For the respondent there was a brief by *Richmond, Jackman, Wilkie & Toebaas* of Madison, and oral argument by *Oscar T. Toebaas*.

The following opinion was filed July 17, 1928:

ESCHWEILER, J. The main contentions on this appeal involve three questions:

(1) Has plaintiff shown a record title to the 3.13 feet strip of land?

(2) Has defendant shown title to the strip by adverse possession?

(3) Did defendant establish a valid and binding agreement between the former owners of lots 3 and 4 fixing the division line at the present south line of defendant's building?

By their answer to the first question of the special verdict to the effect that there was an encroachment by the defendant's building upon plaintiff's lot 3, it was thereby determined that the record title to lot 3 did include the disputed 3.13 feet strip. Upon the conflict of the evidence on this question we think there is support for such finding and that the trial court was correct in confirming such and using it as the basis for the judgment in plaintiff's favor.

For one-half mile south of an unquestioned stone monument found on the line between sections 1 and 12 on the north side of Main street in said village the land had all been platted. An accurate measurement on the ground of this one-half mile showed the exceptionally slight discrepancy of but 1.84 feet between the actual surface and the corresponding distance shown on the plats. The first plat recorded in 1857 was of the property south of West and west of Main streets. The next plat, including the land here in question,

was recorded in 1866. These two plats do not give in figures the width of West street, the territorial highway, but it is scaled, according to the earlier plat, at about sixty-six feet wide, and by the later one at about fifty-two feet, but as occupied by buildings at this intersection, and as apparently generally recognized, it was but three rods or forty-nine and one half feet in width.

The exact location and the width of West street seems to present the substantial difficulty presented in the surveying proposition here involved. The evidence indicated that there has been no noticed or substantial change in the location of this West street since at least 1856, according to the testimony of a Mr. Netherwood, who came to the village of Oregon at the then age of thirteen, and who at one time had owned these lots 3 and 4 as well as lots 1 and 2 in said block 1.

According to the testimony of plaintiff's surveyors, they started at the monument on Main street above mentioned and found an overrun of about ten feet between that point and what they considered to be the south line of said block 1, taken by them to be the north line of West street, as it appeared to them from the buildings on the apparent north line of West street running west from Main, and as checked with an iron stake claimed to have been set many years before as marking the northeast or opposite intersection of West and Main streets.

Some discrepancy is almost universally to be found between the platted distances shown on the earlier surveys and the actual distances found by present-day more accurate measurements. The abnormal overrun of almost ten feet in the distance of 940 feet between the stone monument on Main street and the south line of block 1 as used by plaintiff's surveyors is the most substantial objection to plaintiff's survey found by defendant's expert witness, Professor Ray S. Owen. Distributing this overrun of ten feet on the plat-

ted property between the monument and the south line of block 1 by giving the respective lots, commencing with No. 1 and on through lots 2 and 3, their proportionate share of such overrun, places the line in question here between lots 3 and 4 as 3.13 feet north of the south line of defendant's building; disregarding the overrun there would be an encroachment of 2.1 feet.

Defendant's surveyors, however, in arriving at their conclusion that there was no encroachment by defendant's building on plaintiff's lot 3, assumed, as their starting point, a line between two buildings on the west side of Main street south of West street and in the older plat. This point, however, was over sixty-eight feet south of the building line on West street, while the plat for such location indicated but a sixty-six foot lot. Their calculations, based upon using that starting point and comparing with buildings or lots on the south side of Main street, would leave most of the present buildings in block 1 on their respective lots as shown on the plat, except that it would bring the south line of block 1 as occupied by the building on the corner lot 1 several feet into what would be, according to such method, part of West street, and would give, starting from plaintiff's assumed corner of lot 1, but 94.50 feet frontage for lots 1, 2, and 3 instead of the 98 feet shown on the plat. Professor Owen, however, called by defendant as an expert, frankly stated that he was still of the opinion, expressed to the bank in 1914, and more fully given below, that no satisfactory surveying method of solving the problem was presented on the trial.

Under a situation such as was here presented, it being conceded by all that in determining such matters something akin to empirical means must be resorted to, we feel that the situation thus presented was one in which the conclusion reached by the jury and trial court cannot be overturned.

The question whether title to this strip of land was ac-

quired by adverse possession depends upon the following facts:

Some time about 1886 to 1889 the Mr. Netherwood above mentioned, in erecting a building with an eighteen-foot frontage on lot 3, wished to place the north wall thereof up to what he supposed was the north line of said lot. Without the aid of any surveyor he made measurements starting from the building which he had erected many years before on lot 1 at the corner of West and Main streets. He testified that he intended to allow a forty-eight foot frontage for lot 1 and twenty-four feet for lot 2, but that he could not at the time of the trial recollect whether or not he had considered the frontage of lot 3 to be twenty-four feet to correspond with that of lot 2, or the twenty-six feet of frontage as shown on the plat. He then supposed such north building wall to be on the north line of lot 3 and such wall stood unchanged thereafter, and he at no time made any assertion of claim of title to the north of such wall.

At the time Netherwood built on lot 3 there was then standing on lot 4 a small frame building of about fourteen feet front then owned and used by Johnson, defendant's predecessor in title, as a carpenter shop. The space between these two buildings was variously estimated at between four to seven feet, but with no driveway or walk between them. During the use of this building on lot 4 between 1884 and 1890 by Johnson for his carpenter shop, lumber and window frames were piled at times in this space between these two buildings, but such use was not continuous during that period. For about thirteen years prior to 1914, when the bank acquired title, this small building was used as a millinery shop by a tenant. There was testimony that during such tenancy she used this strip between the two buildings to pass over in putting window screens and storm sash on the south side of the building and in summer she sat there many times. This space was covered with grass and weeds which

were cut at times by Johnson or his tenants. It also appeared that whoever cleared the sidewalks of snow in front of the building on lot 4 during its occupancy by Johnson and subsequently, also cleared the portion of the sidewalk running down to the north line of the Netherwood building on lot 3. From 1914, when the bank built up against the north wall of the then building on lot 3, no protest or objection was made by Netherwood as owner of lot 3 or by the plaintiff, prior to 1926, of defendant's occupancy of this disputed strip.

Under this state of facts we cannot hold, as requested to do by the defendant appellant, that such slight, occasional, non-continuous use of the vacant or waste strip between the two buildings on lots 3 and 4 arose to the dignity of the adverse possession essential to establish a new title in the one asserting it and a loss of title by the one holding the record title.

The conclusion therefore reached by the jury and approved by the trial court, to the effect that there was no adverse possession of the strip of land in question by defendant and its predecessors in title sufficient to destroy the record title to this land, cannot be disturbed.

On the third question here considered, namely, whether there was a valid agreement fixing the boundary line between these two lots as being the north line of the building erected by Netherwood upon lot 3, the jury found by their answers to questions 5 and 6 of the special verdict, *supra,* that there was such an agreement between Netherwood and Johnson and that such was mutually acquiesced in by the two during their respective periods of ownership. The trial court, however, disregarded such findings in directing judgment for the plaintiff, and we think he was correct in so holding.

Mr. Johnson was dead at the time of the trial and Mr. Netherwood testified to such an understanding with Johnson over objections on various grounds, among which, and

finally, was the objection that his testimony would be in violation of sec. 325.16, Stats., as involving a transaction or communication between the witness and the deceased Johnson, because through the latter the defendant here derives his title, if any, to the strip in question. Whatever interest Netherwood may have surrendered and Johnson acquired by any transaction between them at the time Netherwood built on lot 3, in and to the disputed strip, was the interest in the subject matter of the controversy which is being presently asserted by the defendant, for it is through Johnson alone that defendant acquired an interest, if any, in this strip. The testimony, therefore, of Netherwood, so far as it concerned any transactions or communications with Johnson, was within the ban of said sec. 325.16 and properly to be disregarded under the ruling in *Dreger v. Budde,* 133 Wis. 516, 520, 113 N. W. 950.

This position of the trial court was also correct because under the testimony of Netherwood he never at any time had any dispute or question with Johnson about what was the true boundary line between these two lots; and furthermore, it was not such a disputed and unascertainable boundary line which would permit of the making of a valid oral agreement to substitute another line to supplant a true boundary line in accord with the record title, as has been repeatedly held by the decisions of this court on such a question. *Pickett v. Nelson,* 79 Wis. 9, 12, 47 N. W. 936; *Anderson v. Huebel,* 133 Wis. 542, 545, 113 N. W. 975; *Lind v. Hustad,* 147 Wis. 56, 59, 132 N. W. 753; *Wilson v. Stork,* 171 Wis. 561, 565, 177 N. W. 878.

The agreement, if any, between Johnson and Netherwood at the time of the building on lot 3 prior to 1890, attempting to fix a boundary line, was oral, without consideration, concerned an interest in real estate, and was clearly void.

It must be noted that in 1914 and prior to the starting of the erection of its building the bank had Professor Owen of the State University, of unquestioned expert engineering and

surveying skill, examine the perplexing situation that was presented as to the exact location of the lines between the lots in this particular block. He made an examination at that time and then reported to the bank, as stated above, that it was practically impossible to accurately locate the lines in that block, and he advised that an owner of such lot 4 could not then build, as the bank did, with any proper or safe assurance as to where the property lines actually were upon the ground. In spite of such advice the bank proceeded with the erection of the building, with no other or further effort to arrange in any binding manner with the then owners of the other lots, and especially as to the adjoining lots. The building as then erected by defendant, with a twenty-four foot frontage on a lot with a plat frontage of twenty-six feet, was placed as far south as possible, leaving a space of three and one-half feet to the north between the north wall of the bank building and the south wall of the building then, and for a long time prior thereto, standing on lot 5 to the north, of which space, however, some eighteen inches would be under the eaves of that building.

The main and substantial contentions by defendant in this case having been thus disposed of under the facts and the law as we view it, so as to support the judgment of the court below, we deem it unnecessary to discuss the detailed errors asserted by defendant as to some of the language in the charge to the jury on the questions submitted in the special verdict. We find no prejudicial error or grounds for a new trial.

*By the Court.*—Judgment affirmed.

OWEN and STEVENS, JJ., dissent.

A motion for a rehearing was denied, with $25 costs, on October 9, 1928.